IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ELISA M. PYLE,  :
      Plaintiff  :
    v.  : Case No. 3:06-cv-218-KRG-KAP
MICHAEL J. ASTRUE, COMMISSIONER  :
OF SOCIAL SECURITY,  :
      Defendant  :

## Report and Recommendation

### Recommendation

Elisa Pyle appeals from the decision of the Commissioner of Social Security denying her application for disability benefits under Title II of the Social Security Act, 42 U.S.C.§§ 401-33. The Appeals Council considered a memorandum filed by plaintiff, Tr. 345-48, but denied review on September 19, 2006, Tr. 4-6, thus making the ALJ's decision of June 29, 2006, Tr. 11-19, the basis for the Commissioner's decision. Because substantial evidence supports the ALJ's findings that Pyle was not disabled for the period in question, I recommend that the defendant's motion for summary judgment, docket no. 12, be granted, the plaintiff's motion for summary judgment, docket no. 8, be denied, and the decision of the Commissioner affirmed.

### Report

The court's duty in reviewing the Commissioner's denial of disability benefits is to determine whether "substantial evidence," 42 U.S.C.§ 405(g), that is, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," Richardson v. Perales, 402 U.S. 389, 401 (1971), supports the ALJ's findings

that Pyle was not disabled. See Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir.1999); Hartranft v. Apfel, 181 F.3d 358, 359 (3d Cir.1999). The definition of disability for purposes of disability benefits requires an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment ... which has lasted or can be expected to last for a continuous period of not less than twelve months," 42 U.S.C.§§ 423(d)(1)(A). It is the disability, not merely the impairment, that must last or be expected to last twelve months. Barnhart v. Walton, 535 U.S. 212 (2002).

My duty is to examine the whole record, not simply to confirm the existence of those pieces of evidence relied upon by the ALJ, see Reefer v. Barnhart, 326 F.3d 376, 379 (3d Cir.2003) (citation omitted); Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190 (3d Cir.1986), and I have therefore read the entire record, whether cited by counsel or not, to determine whether the ALJ's decision was supported by substantial evidence. Nevertheless, the substantial evidence standard is a deferential one: even in cases where my reading of the record convinces me that I would decide issues differently if my review were de novo, substantial evidence review does not permit me to substitute my judgment for that of the ALJ. See Schaudeck v. Commissioner, 181 F.3d 429, 431 (3d Cir.1999).

2

The ALJ used the five-step disability analysis set forth at 20 C.F.R.§§ 404.1520. See Barnhart v. Thomas, 540 U.S. 20, 24-25 (2003); Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987). The first four steps are not in dispute: (1) Pyle is not working and has not worked since August 1999; (2) she has a severe impairment, namely pain in her genital area as a result of fall in her workplace in May 1999; but (3) that impairment does not meet the requirements of any disability listing. At the fourth step, the ALJ found that (4) Pyle was limited to unskilled work at the light exertion level and so could not return to her relevant past job as a bank teller, which as performed by Pyle was skilled light work. At the fifth and final step, the ALJ found that (5) Pyle retained the residual functional capacity to do the work necessary in a limited range of light and sedentary exertion jobs, mostly clerical in nature.

Pyle was born in February 1960, graduated from high school in 1978, and worked as a bank teller for fourteen years from 1985 to 1999, working in a supervisory position over eight to twelve other workers. Pyle lives in a house with her husband and 20 year old son. Pyle was 39 years old on the date she alleges she became disabled; she was 47 at the time of the ALJ's decision. Pyle alleges that she is disabled because of a nonexertional limitation, pain variously described as vaginal pain, vulvodynia, pudendal neuropathy, and clitoral pain. In May 1999, Pyle slipped at work and fell against the door of a bank vault, striking her pubic area.

3

The record indicates Pyle continued to work until August 1999, Tr. 190-91 (January 8, 2001 letter from Louis Catalano, M.D. to Leonardo Tensuan, M.D.), though Pyle states that she never returned to work. Tr. 83. In either case, Pyle ceased working as a senior teller (except for an unsuccessful attempt to return to work in 2001) and pursued a workers compensation claim until April 2005, when she accepted a commutation payment. Two months later Pyle filed an application for disability benefits, alleging that she had been disabled since May 1999.

The first record of treatment for Pyle's injury was on June 28, 1999, when Philip Basala, D.O., saw Pyle for complaints of clitoral pain. Basala assessed the problem as a rupture of the suspensory ligament of the clitoris and prescribed Percodan for the pain. On June 30, 1999, Basala prescribed Xylocaine spray as well. On that day, Pyle was visiting relatives in Pittsburgh, and drove to the emergency room at the Magee-Womens Hospital in Pittsburgh, complaining of worsening pain. The diagnosis again was clitoral pain. Tr. 132-35. Pyle returned the next day and a pelvic ultrasound was performed to rule out possible referred pain from a kidney stone. Tr. 142. The examining physician, Robert Gedekoh, M.D., noted marked tenderness but no appreciable abnormalities to Pyle's genital area. Tr. 138-39. Gedekoh prescribed Neurontin, an anticonvulsant used off-label as a pain reliever, and scheduled a follow up appointment with a gynecologist. Tr. 341. Kathleen

4

McIntyre-Seltman, M.D., examined Pyle on July 12, 1999, and noted that symptoms of pain had diminished in the last several days. McIntyre-Seltman increased the dosage of Neurontin. Tr. 338-40. A return visit on August 9, 1999, reported Pyle had increasing pain despite the Neurontin, Tr. 337, and McIntyre-Seltman ordered nerve studies, Tr. 323, which showed conduction slowing bilaterally in the pudendal nerve but no other motor or reflex abnormalities in the lower extremities. Tr. 331-32. On August 26, 1999, McIntyre-Seltman performed a nerve block. Tr. 326-30. Two days later Pyle went to the emergency room complaining of severe pain. Tr. 145. Pyle was diagnosed as having a yeast infection and instructed to follow up with McIntyre-Seltman, which Pyle did on August 30, 1999, Tr. 325. McIntyre-Seltman prescribed Percocet, and on September 2, 1999, discussed referring Pyle to a pain management program in a note to an unknown doctor. Tr. 324.

The next medical report occurs five months later in February 2000, when Basala saw Pyle again for her complaints of pain, and for a non-related problem. Tr. 291. Basala performed a peritoneal nerve block on March 16, 2000, which he reported as partly successful. Tr. 285. The nerve block was described as "highly efficacious" in Basala's May 2, 2000 office note, id., and Basala felt Pyle should be weaned off her prescriptions of Neurontin and Elavil (amitriptyline, an antidepressant). In October and November 2000, Basala's office notes reflect concern about Pyle's

5

weight gain as a result of being prescribed amitriptyline, and also that Basala had discussed neuromodulation (a treatment referred to as InterStim) for her continued pain. The Neurontin prescription had apparently been halted and then restarted by a Doctor Steven Goldstein, a neurologist at Allegheny General Hospital who also prescribed Tegretol (another anticonvulsant) for Pyle.

On January 8, 2001, Pyle saw Louis Catalano, M.D., who recounted her treatment history, Tr. 190-92, and changed Pyle's medications. Because Pyle had had surgery for endometrial polyps in March 2000, Tr. 229-31, as well as lithotripsy to break up kidney stones in April 2000, Tr. 233-35, Catalano also ordered an x-ray of Pyle's abdomen, as well as an MRI of the lumbosacral spine. The MRI and x-ray were normal, Tr. 208, 255, and Catalano discussed these findings in an office note of January 31, 2001. Tr. 193. Catalano referred Pyle to Victor Novak, M.D., for assessment of what Catalano thought might be a hernia. Novak saw Pyle on February 5, 2001, noted that Pyle had had three nerve blocks in 1999 and one in 2000. Novak performed an iguinal nerve block on March 19, 2001; office notes in two different handwritings from March 26, 2001, refer to the nerve block as making "no change' in Pyle's symptoms and also as having "helped for 1 week," while Catalano noted after an office visit in May 2001 that Pyle "had definite help" from Novak's nerve block, Tr. 194, and a May 8, 2001 office note from Linda Moran, M.D., a psychiatrist Pyle began seeing in May 2001,

6

states that Pyle reported the injury to her pubic area greatly relieved and that she feels it is "a miracle." Tr. 188.

Pyle was admitted to a hospital for five days in April 2001, because she was suffering from anxiety and depression and had thoughts of suicide. Tr. 356. Pyle began seeing Moran for insight oriented therapy after her discharge from the hospital, and Moran reported that Pyle was physically active (staining her deck, cutting the lawn) and planning to return to work at her bank. Tr. 187. As already noted, Pyle was not successful in returning to work; Pyle told Moran in a visit on June 15, 2001, that because she felt too much pain when wearing underclothing or pads during her menstrual period she was unable to function in public. Tr. 186. Pyle told Moran during her July session, Tr. 184, that she was able to go for walks every day as Catalano had recommended. Tr. 196.

Pyle had an unpleasant encounter with some kind of medical doctor in the summer of 2001; Moran described the doctor as an acupuncturist, Tr. 184, 312, but there are no other records of this episode, except perhaps for a reference in an otherwise unremarkable October 3, 2001 office note by Catalano that "bruising was gone after 3 weeks and 3 days." Tr. 197. Catalano noted that Pyle reported getting better "little by little," though he does not clarify whether he meant from the acupuncture or from the underlying injury. Catalano's next note is not until July 2002, when he reports Pyle as unable to work, prescribes Tegretol, and otherwise

7

makes no changes in her medications or his recommendation that she walk every day. Tr. 198. In the summer of 2002, Pyle was treated at the Somerset Hospital emergency room after she was bitten or stung by an insect. Tr. 223-28.

In September 2002, Pyle was examined by Brian Cicuto, D.O., as part of the workers compensation proceedings. Cicuto opined that Pyle could not return her job as a teller and otherwise made assessment that would translate into a capacity to meet the exertional demands of sedentary work with a sit/stand option. Tr. 306-10. Cicuto also offered several treatment suggestions Pyle had not yet tried that he believed might help Pyle reach maximum improvement. Some other doctor involved in the workers compensation proceedings, whose records do not appear, released Pyle to return to work in the Fall of 2002, because Catalano discusses that opinion in his November 20, 2002 office note.

Basala's next office note is in December 2002, reflecting examination of Pyle only for complaints of breast pain. Tr. 274. Basala next saw Pyle in September 2003, after Pyle experienced a sharp increase in vulvar pain after she bent over to clean up a mess on her kitchen floor. Tr. 272. Although Basala apparently saw Pyle in May 2004 (when he ordered a routine mammography study, Tr. 270-71), there are no further notes from Basala, apparently because Pyle switched to another primary care physician, see Tr. 203. There are no notes from the new physician, D'Onofrio.

8

Moran saw Pyle about once a month during a two year course of therapy from May 2001 until June 2003, and offered the opinion that Pyle was completely disabled by pain in a letter addressed "to whom it may concern" dated June 24, 2003. Tr. 311-13. As noted, Moran's sessions seem to have involved Pyle (and on occasion Pyle's husband) talking about Pyle's life stresses, and there is no indication that Moran ever examined Pyle, administered any objective tests, or had any expertise in evaluating pain. Moran's opinion that Pyle was disabled is nevertheless based on a diagnosis of intractable pain, not psychiatric issues. At the same time, Moran estimated Pyle's GAF as 75, reflecting only slight impairment in functioning, and it is significant that Moran did not suggest that Pyle needed any continuing intervention to manage any psychological issues that might be expected from the presence of constant severe and intractable pain.

Catalano saw Pyle in August 2003, and again in February 2004. Tr. 201, 202. Pyle reported that her pain was "the same" and in August 2003, Catalano prescribed an increase in the dosage of Trileptal (Trileptal is an anticonvulsant similar in structure to Tegretol but reportedly with fewer side effects; it is not clear when Pyle stopped Tegretol and began taking Trileptal) and in February 2004, Catalano recommended Pyle try a lidoderm patch. Catalano reported in his office note of July 21, 2004, that the patch had not helped, and recommended that Pyle see a gynecologist

specializing in vulvodynia. Tr. 203. From December 2004 to May 2005, Catalano noted a reduction in Pyle's Trileptal dosage from 1200 mg/day to 900 mg/day, and a new prescription of Cymbalta, an antidepressant. Catalano notes that Pyle's subjective reports of her symptoms are "the same as always," and his reports of Pyle's physical findings remain relatively unchanged; Catalano notes on some visits that Pyle has a normal gait and on others that she has an antalgic gait, but throughout he notes normal muscle tone and strength. Tr. 204-05.

In August 2003, a physician working for the workers compensation carrier apparently cleared Pyle to return work. As with the similar return to work report referred to by Catalano as having been issued in 2002, the matter does not appear in the record other than by a reference in one of Moran's psychiatric therapy sessions. Tr. 160. In 2004, two more physicians performed evaluations of Pyle in connection with the workers compensation proceedings. John Fisch, M.D., looked at Pyle's medical records and talked with but did not examine Pyle, and opined on August 13, 2004, that Pyle was completely disabled. Tr. 314-15. Pyle also visited Marc Adelsheimer, M.D., who also spoke with Pyle and reviewed her medical records. Adelsheimer noted no difficulty in Pyle's standing and walking, and Pyle refused to perform some of the postural tests Adelsheimer wanted to conduct. Adelsheimer noted that he was not a gynecologist and did not conduct any gynecological examination at

10

Pyle's request. Nevertheless, Adelsheimer offered the opinion on August 24, 2004, that Pyle could perform sedentary work if she could sit in a reclining position. Tr. 316-20. Unlike Fisch, Adelsheimer's report includes a functional capacity evaluation. Tr. 321-22.

There are four records after 2004. In May 2005, Catalano was discussing whether Pyle should be evaluated in a pain clinic. Tr. 205. The next month, on June 24, 2005, Pyle again returned to the Somerset Hospital emergency room for an allergic reaction to being stung by a hornet. Tr. 220-22. Shortly after Pyle applied for benefits, a state agency physician reviewed Pyle's records and opined on July 26, 2005 that Pyle could perform a full range of light work. Tr. 258-65. Finally, in October 2005, Catalano remarks for the first time since January 2001, Tr. 195, that Pyle is "still unable" to wear underclothes, prescribes 30 mg/day of Cymbalta, and increases the dosage of Trileptal to 1800 mg/day. Tr. 268. Catalano also noted that Pyle was taking 1800 mg/day of Neurontin and 40 mg/day of Oxycontin, a narcotic pain reliever, and that Pyle's workers compensation proceeding has ended. Unlike previous office notes, this one does not describe Pyle as disabled. There is no further discussion of referral to a pain clinic, and Pyle was again scheduled for routine follow up in April 2006, which was shortly before the ALJ hearing. Tr. 268.

At the ALJ hearing, Pyle testified that she was in pain all of the time, starting at 8 on a 10 scale, Tr. 360, that she could sleep only 4 hours per night, Tr. 361, that she could never wear underclothing because it aggravated the pain, and that because of her sensitivity to anything touching the area where she was injured her menstrual periods totally disabled her. Tr. 357. Pyle previously estimated that this lasted for two weeks every month, Tr. 83, see docket no. 9, Plaintiff's brief at 2. Pyle stated that she had exhausted all medical options ("there's nothing else out there," Tr. 358) and was left only with drug therapy, the dosages of which were "as high as they could go." Tr. 357. The drugs caused Pyle difficulty in concentrating and made her drowsy and tired, but not to the point where she could sleep. Tr. 355. Pyle did some housework, including laundry, vacuuming, and cooking, after she and her husband made changes to the house that would minimize Pyle's bending at the waist. Tr. 358.

The ALJ could note, when considering Pyle's credibility, the evidence of record contradicting Pyle's claim that there is nothing else out there for her pain: Cicuto and Basala made several recommendations for treatments other than drug therapy that Pyle has not employed, and Catalano's notes that either he or Pyle should explore referring Pyle to a pain clinic have not been acted on. No record corroborates Pyle's claims that her pain medications are at maximum, and my reference work (The Complete Pill Guide (2d ed.

12

2005)) advises that the maximum adult dosage for Neurontin is 3600 mg/day, twice the dosage prescribed for Pyle, and the maximum adult dosage for oxycodone is 15 mg every 4 to 6 hours, about twice the dosage prescribed for Pyle. This is not to say that Pyle's doctors may not have told Pyle her dosages are as high as possible or even that Pyle's doctors do not consider those dosages the maximum allowable, it is just to point out that there is nothing in the record which corroborates Pyle's claim. The ALJ obviously took Pyle's complaints of sleep loss and concentration difficulty into account by limiting her to simple routine repetitive tasks well below the skill level of the job Pyle had performed. Just as obviously the ALJ disbelieved Pyle's claim to be incapacitated during every menstrual period by her inability to wear anything next to her skin.

Substantial evidence to support the ALJ's rejection of a claimant's testimony can be found where there is a lack of support in the record for the claimant's subjective complaints. It is the case that:

[I]n all cases in which pain or other symptoms are alleged, the determination or decision rationale must contain a thorough discussion and analysis of the objective medical and the other evidence, including the individual's complaints of pain or other symptoms and the adjudicator's personal observations. The rationale must include a resolution of any inconsistencies in the evidence as a whole and set forth a logical explanation of the individual's ability to work.  SSR 95-5p (Considering allegations of pain and other symptoms in residual functional capacity and individualized functional assessments and explaining conclusions reached) 1995 WL 670415, *2.

13

The ALJ gave two major reasons for crediting Pyle's nonexertional impairment only to the point that it disabled her from more complex work: that the medical experts who gave opinions were obviously influenced by their retention in an adversary compensation proceeding, and that the objective evidence did not support the extent of the impairment claimed by Pyle. Tr. 16. Although it is unfortunate that the ALJ's report reads like a template of an opinion, rarely departing from a cookie cutter-like discussion of the application of the Agency's regulations, my review of her reasoning is not for literary merit, but for substantial support in the record.

The ALJ discharged her duty to consider seriously a claimant's subjective complaints of pain. Green v. Schweiker, 749 F.2d 1066, 1068 (3d Cir.1984); Chrupcula v. Heckler, 829 F.2d 1269, 1276n. 10 (3d Cir.1987); Kent v. Schweiker, 710 F.2d 110, 115 (3d Cir.1983). The ALJ also recognized her duty, see Tr. at 14-17, to give great weight to evidence from a treating physician. See 20 C.F.R.§ 404.1527; Gilliland v. Heckler, 786 F.2d 178 (3d Cir. 1986). But an ALJ is not required to accept even a treating physician's opinion of disability which is not supported by medical evidence, Newhouse v. Heckler, 753 F.2d 283, 286 (3d Cir. 1985); Torres v. Schweiker, 682 F.2d 109, 112 (3d Cir. 1982), or which is contradicted by other medical evidence. Frankenfield v. Bowen, 861 F.2d 405, 408 (3d Cir.1988).

14

Pyle began treatment about six weeks after her accident, beginning in late June 1999; in 2000 she had unrelated impairments from kidney stones and benign polyps; by May 2001 she was describing her pain as greatly relieved and like a miracle, Tr. 188. She had a bad episode after bending to clean the kitchen floor in 2003, Tr. 272, but after that the medical record is stable. Pyle's treating physician, Catalano, gives an opinion of disability consisting entirely of unexplained summary entries in office notes. Catalano offered to give a more detailed opinion, Tr. 267, and the omission from the record of such an opinion, or of reports or notes from other physicians who treated Pyle could be considered by the ALJ as a lack of evidence of disability. This is so particularly in light of the ability of the plaintiff to procure opinions from Cicuto, Fisch, and Adelsheimer. The ALJ could properly discount the weight given to the opinions of these latter doctors because they were retained in adversary litigation, because they could hardly be described as examining physicians and, in Adelsheimer's case, because he did not even claim to practice in the relevant specialty. As for Moran, the other treating physician who offered an opinion of disability, she too is opining outside her area of treatment. While Moran's partisan tone may not be inappropriate, the lack of objective support for her conclusion could certainly be taken into account by the ALJ.

15

Again, it would have helped if the ALJ had explained her reasoning in more detail in evaluating Pyle's testimony, but the ALJ could conclude that Pyle's testimony that every day at her best she was at 8/10 on the pain scale and that she was totally incapacitated for up to 50% of her life for the seven years up to the date of the ALJ hearing is inconsistent with the stable and routine course of medical care Pyle has pursued. Compare Maiorano v. Barnhart, 105 Fed.Appx. 374 (3d Cir.2004)(aggressive weekly treatment of reflex sympathetic dystrophy with trigger point injections and transcutaneous electrical stimulation). Pyle sees only Catalano on a routine basis about twice a year, Tr. 354-55, and Catalano's records do not describe anything like the intensity of the symptoms Pyle testified to. Catalano's reports of normal strength and muscle tone would be difficult to square with Pyle's claim to be limited to sitting in a recliner watching television, see Tr. 362-63. More significantly, it is almost unbelievable that Pyle, who has insurance, Tr. 354, see Newell v. Commissioner, 347 F.3d 541, 547 (3d Cir.2003)(ALJ must consider alternative reasons for lack of medical treatment such as lack of insurance) would not have pursued one of the additional options for treatment described by Basala, Cicuto, or Catalano if she were suffering the level of pain she testified to for the seven years prior to the ALJ hearing.

In sum, the ALJ had substantial evidence to support her partial rejection of Pyle's testimony about the **severity** of her pain

because of the variance between Pyle's routine schedule of medical examination by Catalano and her testimony about all of her limitations at the hearing before the ALJ, and because of the lack of relevant expertise or a foundation based on examining the patient for the opinions of Moran, Cicuto, Fisch and Adelsheimer that Pyle was completely or partly disabled. The ALJ did not lack an evidentiary basis for crediting Pyle's claims of disabling pain only in part. See Simmonds v. Heckler, 807 F.2d 54, 56-58 (3d Cir.1986)(claimant's testimony that she had disabling pain accepted by ALJ in finding claimant capable of exertional demands of no more than sedentary work; ALJ not ignoring testimony by refusing to accord it full credence). The ALJ therefore had substantial evidence on which to base her hypothetical questions to the vocational expert and ultimately on which to base her finding of nondisability. The Commissioner's decision should therefore be affirmed.

Pursuant to 28 U.S.C.§ 636(b)(1), the parties are given notice that they have ten days to serve and file written objections to this Report and Recommendation.

DATE: July 23, 2007

Keith A. Pesto,
United States Magistrate Judge

Notice to counsel of record by ECF

17